## UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

### CASE NO. _____

| | |
|---|---|
| HAMPSHIRE HOUSE CORPORATION, | ) |
| | ) |
| Plaintiff, | ) |
| v. | ) |
| | ) |
| FIREMAN'S FUND INSURANCE | ) |
| COMPANY, a California Company, | ) |
| ASSOCIATED INDEMNITY | ) |
| CORPORATION, a California | ) |
| Corporation, and ALLIANZ GLOBAL | ) |
| RISKS UNITED STATES INSURANCE | ) |
| COMPANY, an Illinois Company. | ) |
| | ) |
| Defendants. | ) |
| | ) |

## COMPLAINT

### Introduction

This case is about whether Plaintiff Hampshire House Corporation's ("Hampshire") insurance policy provides coverage for damages sustained and/or expenses incurred by Hampshire as a result of unprecedented emergency Orders by state and local officials of the Commonwealth of Massachusetts restricting Hampshire's on-premises business activities. The emergency Orders were intended to protect people and property for imminent serious and irreparable injury. A paginated copy of the Policy (with a Table of Contents) is attached hereto as Exhibit "A."

Hampshire hereby sues defendants Fireman's Fund Insurance Company, Associated Indemnity Corporation and Allianz Global Risks United States Insurance Company, (hereinafter defendants), and states:

## PARTIES

1.  Hampshire is a Massachusetts Corporation which operates restaurant and retail sales businesses in the County of Suffolk, Commonwealth of Massachusetts. The relevant properties are as follows:

   a.  Cheers, 84 Beacon Street, Boston, Massachusetts (restaurant and bar service, function facilities and retail sales);

   b.  75 Chestnut Street, Boston, Massachusetts (restaurant and bar service);

   c.  Cheers, Faneuil Hall, Boston, Massachusetts (restaurant and bar service, separate retail sales); and

   d.  75 on Liberty Wharf Bar & Grill, Boston, Massachusetts (restaurant and bar service).

2.  Defendant Fireman's Fund Insurance Company (FFIC) is a California corporation with its principal place of business in Illinois. FFIC is part of the Allianz Group of companies and is authorized to conduct business in the Commonwealth of Massachusetts.

3.  Defendant Associated Indemnity Corporation (AIC) is a California Corporation with its principal place of business in Chicago, Illinois. AIC is a subsidiary of Allianz. AIC conducts business in Massachusetts and issued the insurance policy at issue in this litigation.

4.  Defendant Allianz Global Risks US Insurance Company (Allianz) is an Illinois corporation with its principal place of business in Illinois. Allianz, the world's largest property and casualty insurance company by revenue, is authorized to conduct business in the Commonwealth of Massachusetts.

## JURISDICTION AND VENUE

5.      This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1332.  Diversity exists between the Hampshire and Defendants and the amount in controversy exceeds $75,000, exclusive of interests and costs.

6.      Venue is proper in this forum pursuant to 28 U.S.C. § 1391 because the events giving rise to Hampshire's claims occurred in this District and  the property that is the subject of the action is situated in this District.

## FACTS

### I.      The Hampshire House Policy

7.      Hampshire purchased commercial business-owners insurance policy # S 30 MZX 80998638 (the Policy) from the insurer on or before effective August 1, 2019.  Ex. A hereto.[1]  The policy period for the Policy is from August 1, 2019 through August 1, 2020.  The Policy insured Hampshire's restaurants and store.    The Policy is incorporated herein and made a part of the Complaint.

8.      The Policy is an all-risk commercial property insurance policy that provides coverage for physical loss of or damage to the insured property from all risks unless expressly limited or excluded by language in the body of the Policy or through a separate exclusion endorsement.

9.      The Policy includes cause of loss coverages for business income losses and extra expenses from all risks including for civil authority actions.

10.      The Policy provides blanket coverage limits of $10,860,000 for business income losses and expenses.

---

[1]  Exhibit A sets forth the Policy, with a Table of Contents and page numbers, prepared by Hampshire's counsel for the convenience of the Court.

11.     There is no exclusion in the Policy for lost business income and expenses caused by emergency Orders restricting Hampshire's business activities at their properties.

12.     The Policy sold by the defendants to Hampshire, like all insurance policies, must be read as a whole.

13.     The defendants have numerous duties under the insurance policy, including (but not limited to) answering insured questions regarding coverage, receiving loss notices, investigating and assessing claims, and issuing declination of coverage letters (when applicable).

14.     All conditions precedent to this action have been performed or have been waived.

**II.     State and Local Emergency Orders**

15.     It is no secret that the world is in the midst of a pandemic. When it became apparent that the mere publicity around COVID-19 would not naturally facilitate voluntary strict social distancing and curtailing of social-gathering business operations (such as restaurants), state and local authorities intervened through a series of emergency Orders.

16.     Commencing on March 13, 2020 and continuing to the present, Massachusetts Governor Charlie Baker issued of a series of Executive Orders designed to prevent and limit the spread in the Commonwealth of COVID 19, a worldwide pandemic virus.  The Order prohibited gatherings of more than two-hundred fifty people.

17.     On March 15, 2020, Governor Baker further Ordered restaurants to cease on-premises consumption of food or drink.  The Order further required no gathering of more than twenty-five people.

18.     Similarly, starting March 15, 2020, Marty Walsh, the Mayor of Boston, issued Executive Orders prohibiting the retail on-premises restaurant and bar services and retail operations of Hampshire's businesses in the City of Boston

19.     On March 23, 2020, Governor Baker, with the support of the Department of Public Health, issued an Order requiring the mandated closure of businesses in the Commonwealth, effective March 24, 2020.  The Order provided as follows:  "All businesses and other organizations that do not provide COVID-19 Essential Services shall close their physical workplaces and facilities ("brick-and-mortar premises") to workers, customers, and the public as of 12:00 noon on March 24, 2020 and shall not re-open to workers, customers, or the public before 12:00 noon on April 7, 2020." The Order further limited gatherings of ten of more people, rescinding a previous March 15, 2020 Order that limited on-premises consumption of food and gatherings of more than twenty-five people.  Subsequent Orders prohibited Hampshire's business operations until after June 1, 2020.

20.     These Orders were intended to protect people and property from imminent substantial harm.

21.     For the most part (including those causing Hampshire's losses), the emergency Orders were issued pursuant to an executive's emergency powers. They were not the result of the legislative or deliberative body's process typical of laws and regulations.

22.     Hampshire has complied with all Executive Orders issued by Governor Baker and Mayor Walsh.

23.     These unprecedented emergency Orders affecting Hampshire were not a foregone conclusion or obvious consequence of the Covid 19 pandemic, as evidenced by the great variance between states and localities as to the types and extent of restrictions placed on businesses and public activities.

24.     A national debate has evolved concerning the orders' necessity, appropriateness, breadth and length, with some high-profile federal and state officials in some circumstances questioning the motivation behind them.

III.     **Hampshire's Business and Business Activities**

5

25.     Hampshire's business consists of four restaurants, and two stores, all located in Suffolk County in the Commonwealth of Massachusetts.  Hampshire has been serving the Boston Area community for decades, and some of its restaurants have acquired quintessential Boston landmark status.

26.      Hampshire's signature business is a popular Boston landmark known as "Cheers." Cheers is a pub and restaurant located in the Beacon Hill neighborhood of Boston, Massachusetts, across from the Boston Public Garden.  Founded in 1969 as the Bull & Finch Pub, Cheers is best recognized by tourists as the exterior of the bar seen in the hit NBC sitcom *Cheers*, which ran between 1982 and 1993.

27.     Cheers is a tourist attraction, both at Faneuil Hall (also a tourist attraction) and at 84 Beacon Street, which is one of the famous Trolley stops.  It is a destination for domestic and international tourists. All ages visit Cheers at 84 Beacon Street because Cheers was a show that parents loved or a show that visitors saw on a cable re-rerun channels.  Tourists are seen taking their pictures in front of the Cheers sign every day of the year.  Hampshire realizes approximately seventy per cent of its sales between the Boston Marathon weekend (in April) and Columbus Day weekend.  The business income generated between April and October helps assist Hampshire through the slower winter months.

28.  The Hampshire House at 84 Beacon Street is made up of 3 individual activities.

(i) There is the Cheers food and beverage business on the first level as well as in the basement. The Cheers pub is open for lunch and dinner and has a full food and bar menu.

(ii)     There is a Cheers retail store and the pub on the first floor.

(iii)    The second and third floor is where Hampshire provides for function events.  The function events compliment the Cheers business in the off season of the Cheers tourist business.  Function events are held breakfast, lunch and dinner engagements.[2]

(iv)    75 Chestnut Street is a small local bistro; it is an American comfort food type of place with 83 seats including the bar.  Providing a full food and bar menu, 75 Chestnut is a local hangout, situated in the very nice Beacon Hill neighborhood. It is open at night during the week and for brunch and dinner on the weekends.

(v)    75 on Liberty Wharf Bar & Grill has a large patio area, with indoor seating limited to approximately 84 including the bar.  75 Liberty Wharf is a seasonal restaurant and bar, earning most of its revenue from the patio, weather permitting.  Winter months are generally slow.

(vi)    Faneuil Hall Cheers conducts two separate operations. One is for the food and beverage area; the second is for the retail store which is located adjacent to the restaurant.  The restaurant is open for lunch and dinner every day with a full bar and food menu. Retail also open 7 days a week. Faneuil Hall Cheers (restaurant and retail) are a tourist attraction, as Faneuil Hall itself is a destination.

29.    Hampshire's business activities include, *inter alia*, the procurement, preparation, and sale of food and beverage items; the sale of products and merchandise; the management and training of employees, marketing, accounting, and the maintenance of physical structures and equipment.

---

[2]   Unfortunately, these events started cancelling in March with a lot of refunds given and/or events rebooked out a year.

30.     Hampshire's business activities includes various services it provides to its customers, including, *inter alia*, on-premises dining and table service, delivery service, take-out service, and special function events.

31.     Most of Hampshire's restaurant revenue derives from the on-premises dining, and table service.  The attraction of Hampshire's venues, rests in part, with the *Cheers* experience offered to visitors.

32.     A significant portion of Hampshire's revenue is derived from out-of-state and in-state tourists.

33.     Cheers at 84 Beacon Street restaurant services closed on March 20, 2020.  Retail operations closed on March 17, 2020.  Business resumed on June 24, 2020 for the pub and for retail.  To date, there are no function events.

34.     75 Chestnut closed on March 20, 2020 and reopened on May 5, 2020 for takeout until inside seating.  On reopen, there was a small patio area set up in the street, seating only 15 customers.  Takeout during the shutdown operated at a loss.

35.     75 Liberty on Wharf closed March 16, 2020 and reopened June 8, 2020 with outdoor seating at 50% capacity.

36.     The Faneuil Hall restaurant closed March 17, 2020 and reopened with patio seating on June 24, 2020.   Hampshire spent in excess of $20,000 to expand the patio at Faneuil Hall. The Faneuil Hall retail store closed March 17, 2020 and reopened on June 24, 2020.

37.     While grocers or retailers may provide a simple location for customers to purchase ready-to-eat or take-away food and beverages, Hampshire offers something more: an on-premises dining experience which requires the availability of Hampshire's insured's properties.

38.     Hampshire derives a substantial amount of revenue from its on-premises dining and alcohol sales, and its retail merchandise sales.

39.     Retail merchandise sales are dependent on the proximity of on-premises dining and alcohol sales.

40.     These services are the essence of Hampshire's business and a primary reason its customers pay a premium to make food, alcohol and retail purchases.

**IV.     Hampshire's Losses – The Devastating Slowdown and/or Cessation of Hampshire's Business**

41.     Beginning in March 2020, Hampshire was forced to severely restrict the services it could provide at its properties as a result of the emergency Orders described herein.

42.     To comply with the emergency Orders, Hampshire was required to slow down and eventually cease its business activities, most importantly the provision of on-premises dining and alcohol service, as well as in-store shopping.

43.     When Hampshire closed its restaurant operations, it suffered substantial losses of food and perishable inventories.

44.     Beginning March 15 and continuing through various phases, Hampshire was not permitted to provide on-premises dining services, operating in some situations with takeout and delivery services only. After June 8, 2020 (Phase 2), Hampshire operated only with limited capacity on-premises dining and on-premises shopping services.

45.     As a direct result of the emergency Orders issued by Governor Baker and Mayor Walsh to mitigate risk of physical harm to people and property, Hampshire has incurred a physical loss of and damage to their insured properties for regular business operations.

46.     Specifically, Hampshire lost the ability to provide restaurant, alcohol and retail sales at their insured properties, was denied use of the insured properties to provide restaurant,

alcohol and retail sales at their insured properties, their customers were prevented from physically occupying the properties, causing the properties to be physically uninhabitable by customers, causing Hampshire's core business functions to be nearly eliminated or destroyed, all of which caused and constituted a suspension of Hampshire's business operations at its insured properties.

47.     This loss of and damage to Hampshire's insured properties caused Hampshire a substantial loss of business income with substantial incurred extra expenses renovations, cleaning, training and re-stocking.

48.     But for the emergency Orders, Hampshire would not have suffered such economic business income losses.

49.     Hampshire's losses and expenses at its insured properties have continued through the date of filing of this action.

50.     Hampshire's actions were reasonable and necessary to comply with the various Orders and to mitigate the damages described herein.

51.     Hampshire's causes of loss are not excluded by the Policy.

52.     Hampshire has suffered substantial losses of insured business income and has incurred insured expenses caused by insured causes of loss within the terms and conditions of the Policy.

**V.     Background to Business Interruption Insurance**

53.     At its core, business interruption insurance (or 'business income' insurance as it is known today) ("BI") is meant to return an insured's business the amount of profit it would have earned had there been no interruption of business or suspension of operations. To assist an understanding of BI's context and coverage in Hampshire's Policy (read as a whole), Hampshire offers the following factual background allegations.

54.     BI was developed in the United Kingdom in the early 19th century as a supplement to fire insurance. Insurers would compensate commercial building owners not only for the physical damage but for the insured's inability to utilize the building to collect rent (the primary business of the insured). The first "loss of rent" coverage was offered by the English Hamburg Fire Office in 1817.

55.     BI continued to evolve, and by the mid-19th century, insurers in Europe were offering "stoppage or cessation" insurance that provided coverage for lost business income due to the inability to utilize the insured's property.  Typically, such insurance offered a fixed percentage of what a company's stock on hand would have generated for business income.

56.     By the late 19th century, BI had come to the United States. In 1880, Boston-based insurer Dalton introduced "Use and Occupancy" insurance.  This coverage insured the loss of production following a covered peril. Typically, the policy provided for a set dollar amount of recovery for each day the insured was prevented from conducting business operations. "Use and Occupancy" continued to be the nomenclature adopted by American insurers up until the 1940s.

57.     In the late 1930s, insurers began offering "Gross Earnings" insurance. This was an iteration of BI which compensated insureds for the reduction in gross earnings due to a business interruption caused by a covered peril.

58.     In 1986, the Insurance Services Office (ISO) recommended replacing the "Gross Earnings" policy form with the "Business Income Coverage" from.  This form with various modifications is used today.

59.     The coverage in certain policies, such as Hampshire's, is tied to the insured's interest in its income stream.  This coverage protects an insured's business losses when occurring in accordance with the policy language concerning covered causes of loss.

60.     Though it has evolved over centuries, the purpose of BI insurance has always been to return to insureds (such as Hampshire) the losses of business income resulting from the slowdown or cessation of their business.

**VI.     Hampshire Purchased Insurance for Its Business, Not Just Its Buildings**

61.     In order to protect its property, businesses, and income from losses, Hampshire purchased the insurance policy sold by Associated Indemnity Corporation, an entity owned by Fireman's Fund.  Upon information and belief, both these entities are owned by Allianz Global Risks United States Insurance Company.

62.     At all relevant times, the Policy was in full effect as Hampshire paid the six-figure premiums due which Defendants accepted.  Hampshire has been insured with Defendants for the last several years, paying the required premiums annually.

63.     At all times, Hampshire has relied on the defendants' promises to cover its insured business income losses and its additional extra expenses caused by such losses.

64.     The premium Hampshire paid included coverages for, *inter alia*, buildings and personal property, business income and extra expense, crisis management, off-premises special event cancellation, and commercial liability.  It also included additional coverage for 'extended' business income, civil authority, and a special endorsements tailored to its type of business, i.e.: Property-Gard Restaurant Plus Extension Endorsement, Hospitality Industry Additional Coverage Extensions Endorsement.  The coverages are set forth in Exhibit A.

**VII.    The Insurer's Duties**

65.     Hampshire, like others, purchased its insurance policy for business income protection caused by unforeseen disaster.

66.     During such times, individuals and businesses (including Hampshire) are vulnerable and dependent on the defendants' promises of coverage, a fact of which insurance companies (including defendants) have knowledge.

67.     Insurance companies promise, warrant and sell "peace of mind" that in the unlikely event of a catastrophe or disaster the policyholder will be fully and promptly protected.

68.     The contract of insurance carries with it a duty of utmost good faith on the part of the insurer because of the vulnerability of policyholders during and following an insured cause of loss.

69.     The defendants' duties include but are not limited to defendants' obligation to fairly and quickly adjust Hampshire's claims to determine coverage and amount of loss, adjust its insurance claims, and providing prompt payment.

70.     In addition to a contractual duty, an insurer's duty of good faith and fair dealing exists under both Massachusetts common law and G. L. c. § 176D and G. L. c. 93A and regulations of the Commonwealth thereto.

71.     Here, defendants failed to make a good faith investigation, determine coverage and adjust Hampshire's claims because defendants reached a pre-determined conclusion to deny coverage.

72.     Defendants have adopted an arbitrary position to deny all business interruption claims like Hampshire's, despite different circumstances, different executive orders, and differences in policies.   Defendants' website provides:

> In general, any standard property and business interruption coverage must be triggered by physical loss or damage to property at an insured location and infectious disease is usually not a covered peril.

Allianz, *Update in Response to COVID-19 – Claims Handling*,

https://www.agcs.allianz.com/news-and-insights/news/coronavirus.html#claims.  See also,

https://www.agcs.allianz.com/news-and-insights/news/coronavirus.html

73.    The defendants' one-size-fits-all approach to their contractual, statutory and common law duties to act reasonably and in good faith to investigate claims, decide policy coverage, and make claim adjustments has led to the improper denial of countless business interruption claims, including Hampshire's.

74.    Hampshire (like others who purchase business interruption insurance) has faithfully paid its premiums.  Yet, when Hampshire made a claim because of a catastrophic business interruption caused by state and local emergency Orders, the defendants summarily and arbitrarily denied Hampshire's claims.  Hampshire (like many businesses) has relied on its business interruption insurance to cover what it is supposed to cover – replacement of business income and payment of ongoing expenses in order to rebuild its businesses.

75.    Accordingly, Hampshire brings this suit in response to defendants' breach of their contractual obligations to pay Hampshire's covered loss and properly adjust Hampshire's claims.

**VIII.   Relevant Policy Provisions Provide Coverage for Hampshire's Loss**

76.    The losses and expenses incurred by Hampshire's business operations are covered under various policy provisions.

**A.    General Provisions**

77.    The Policy is organized into three section: General Forms and Endorsements, Property Forms and Endorsements (which includes Business Income), and General Liability Forms and Endorsements.   The Policy must be read as a whole.

78.     The Policy provides coverage for certain property, specifically physical buildings and personal property, and distinctly for business income.

79.     With respect to the property forms and endorsements, the Policy has the following limits: blanket limits of $10,000,000 for Building Personal property; limits of $6,877,500 for Business Real Property; limits of $10,860,000 for business income (i.e., business interruption losses).   Other pertinent Coverage limits are set forth therein.

80.     As stated, the Policy is an all-risk commercial property insurance policy that provides coverage for physical loss of or damage to the insured property from *all risks* unless expressly limited or excluded by language in the body of the Policy or through a separate exclusion endorsement.

81.     There is no exclusion in Hampshire's Policy for the loss of business income caused by emergency Orders resulting in the physical loss of or damage to Hampshire's properties.

**B.     Business Income Coverage**

82.     Hampshire's business interruption coverage provides for loss of business income.

83.     The Policy provides:

> "We will pay for the actual loss of Business Income you sustain due to the necessary suspension of your 'operations' during the 'period of restoration'. The suspension must be caused by direct physical loss of or damage to property at premises which are described in the Declarations, including personal property in the open (or in a vehicle) within 100 feet, caused by or resulting from any Covered Cause of Loss."

84.     "Business income" is defined in relevant part as "(1) "(a) Net Income (Net Profit or Loss before income taxes) that would have been earned or incurred; and (b) Continuing normal operating expenses incurred, including payroll."

85.     "Operations" is defined as "business activities occurring at the described premises…"

15

86.     Hampshire has suffered a substantial loss of Business Income during the policy term which were caused by the loss of or damage to their insured property at the covered locations.

87.     Moreover, various specified extensions and coverages are available under the Property Gard Restaurants Plus Extension Endorsement, including but not limited to a 180 day extension of BI, and additional Extra Expenses, Expediting Expense and Loss Adjustment Coverages.

**C.      Extra Expense Coverage**

88.     The Policy includes coverage for 'Extra Expense' which are "necessary expenses you incur during the 'period of restoration' that you would not have incurred if there had been no direct physical loss or damage to property caused by or resulting from a Covered Cause of Loss." Here, Hampshire incurred expenses relating to, *inter alia*, cleaning, sanitization, and personal protective equipment for its employees and staff.

**D.      Civil Authority Coverage**

89.     The Policy includes Civil Authority coverage which means

> "…the actual loss of Business Income you sustain and necessary Extra Expense caused by action of civil authority that prohibits access to the described premises due to direct physical loss of or damage to property, other than at the described premises, caused by or resulting from any Covered Cause of Loss. This coverage will apply for a period of up to two consecutive weeks from the date of that action."

90.     As described above, Orders from a civil authority caused Hampshire's insured properties to be physically uninhabitable and/or substantially unusable. In turn, the prohibited access to and use of Hampshire's insured properties caused Hampshire to incur covered business income losses and incur necessary extra expenses.

**D.      Crisis Management Coverage**

91.     The Policy includes coverage for actual loss of crisis event business income sustained due to the necessary "suspension" of the insured's business "operations" during the "crisis event period of restoration."     The coverage states that the "suspension" must be caused by or result from a "covered crisis event" at the "covered premises."     There is also coverage for 'crisis event extra expense' and 'post crises event expense'.  Here, Hampshire incurred expenses due to a covered Crisis Event, including loss of business income, extra expenses, and other costs included cleaning, sanitation, and personal protective equipment for its employees and staff.

### IX.     The Arbitrary Denial of Hampshire's Claim

92.     On March 17, 2020, Hampshire provided its first notice of loss to Defendants and showed it had incurred business income losses during the policy term.

93.     On June 16, 2020, Defendants denied the claim without any meaningful or honest investigation of the facts or contractual terms.  See Exhibit B.  Exhibit B s incorporated herein and made a part of the Complaint.

94.     Defendants summarily and arbitrarily asserted that the Hampshire's losses were not caused from direct physical loss of or damage to covered property, but provided no basis therefore.

95.     Defendants summarily and arbitrarily did not adjust potential losses under the Policy coverages.

96.     Without reasonable investigation, defendants made summary coverage determinations as to the inapplicability of civil authority coverage, crisis event coverage, off-premises special event coverage, but provided no basis for their factual conclusions.

97.     The losses Hampshire suffered are covered under the Policy, but Defendants have denied coverage despite Hampshire's timely notice of its claim.

98.     Defendants have breached the Policy and it other lawful duties by failing and refusing to adjust Hampshire's claims under applicable coverages, and refusing to adjust and promptly pay Hampshire's business income losses and claims.

99.     Defendants were obligated under the Policy to cover and pay Hampshire's losses and expenses but have failed and refused to do so.

## COUNT I

## BREACH OF CONTRACT

100.     Hampshire incorporates by reference the preceding paragraphs as though fully set forth herein.

101.     Hampshire purchased a commercial property insurance policy from the defendants.

102.     Hampshire has performed all its obligations as specified by the Policy including the payment of all premiums due.

103.     Hampshire's Policy provides coverage for business income loss, extended business income loss, and/or extra expense coverages.

104.     Hampshire has suffered and continues to suffer physical loss of and/or damage to its insured properties at the covered locations, which was caused by or resulted from the emergency Orders described herein.

105.     The physical loss of and/or damage to Hampshire's insured properties caused the necessary slowdown and cessation of Hampshire's business activities, resulting in a loss of business income.

106.     The Policy also provides that the defendants will pay for any necessary expenses that Hampshire incurs that it would not have incurred had there been no physical loss or damage to its property.

107.    Defendants are in breach of the Policy by refusing to adjust potential losses under other potentially applicable coverages, such as those provided under the Property Gard Restaurant Plus Extension, Crisis Management, Hospitality Industry Additional Coverage Extensions Endorsement and/or Civil Authority coverage.

108.    As a result of the defendants' repudiation or breach of the insurance policies, Hampshire has suffered damages.

**WHEREFORE**, Plaintiff seeks compensatory damages resulting from the Defendants' breach of contract and further seeks all relief deemed appropriate by this Court, including attorneys' fees, interest as provided by G. L. c. 231, § 6C, and costs.

## COUNT II

## <u>BREACH OF THE COVENANT OF GOOD FAITH AND FAIR DEALING</u>

109.    Hampshire incorporate by reference the preceding paragraphs as though fully set forth herein.

110.    In the Commonwealth, the defendants are bound by the implied contractual covenant of good faith and fair dealing.

111.    The defendants did violate the covenant of good faith and fair dealing.

**WHEREFORE**, Plaintiff seeks compensatory damages resulting from the Defendants' breach of covenant of good faith and fair dealing, and further seeks all relief deemed appropriate by this Court, including attorneys' fees, interest as provided by G. L. c. 231, § 6C, and costs.

## COUNT III

## <u>VIOLATION OF G. L. c. 176D</u>

112.    Hampshire incorporates by reference the preceding paragraphs as though fully set forth herein.

113.     The defendants conduct as alleged herein violates, *inter alia*, the provisions of G. L. c. 176D, § 9.

**WHEREFORE**, Plaintiff seeks compensatory damages resulting from the Defendants' breach of contract and further seeks all relief deemed appropriate by this Court, including attorneys' fees, interest as provided by G. L. c. 231, § 6C, punitive damages and costs.

**COUNT IV**

**VIOLATION OF G. L. c. 93A**

114.     Hampshire incorporates by reference the preceding paragraphs as though fully set forth herein.

115.      The defendants are engaged in trade or business in the Commonwealth within the meaning of G. L. c. 93A, § 11.

116.     The defendants' conduct as alleged herein constitute knowing unfair and deceptive acts and practices in violation  of G. L. c. 93A, the Attorney General's regulations, and G. L. c. 176D.

**WHEREFORE**, Plaintiff seeks compensatory damages resulting from the Defendants' breach of contract and further seeks all relief deemed appropriate by this Court, including attorneys' fees, interest as provided by G. L. c. 231, § 6C, punitive damages and costs.

**DEMAND FOR A JURY TRIAL**

Plaintiff request a jury trial for any and all Counts for which a trial by jury is permitted by law.

Respectfully submitted,
Attorney for Plaintiffs

/s/ Jonathan T. Merrigan
J. TUCKER MERRIGAN, BBO # 681627
PETER M. MERRIGAN, BBO # 673272

THOMAS T. MERRIGAN, BBO # 343480
**SWEENEY MERRIGAN LAW, LLP**
268 Summer Street, LL
Boston, Massachusetts 02210
Tel.:    617-391-9001
Fax:     617-357-9001
tucker@sweeneymerrigan.com
peter@sweeneymerrigan.com
tom@sweeneymerrigan.com

And

/s/ Allan Kanner
Allan Kanner, Esq. (*pro hac vice* forthcoming)
Cynthia St. Amant, Esq. (*pro hac vice* forthcoming)
**KANNER & WHITELEY, LLC**
701 Camp Street
New Orleans, LA 70130
Tel: (504) 524-5777
Fax: (504) 524-5763
a.kanner@kanner-law.com
c.stamant@kanner-law.com