### UNITED STATES DISTRICT COURT
### DISTRICT OF MASSACHUSETTS

_____
                                    )
**HAMPSHIRE HOUSE CORPORATION,**     )
                                    )
       **Plaintiffs,**                  )
                                    )
       **v.**                          )        **Civil Action No.**
                                    )        **20-11409-FDS**
**FIREMAN'S FUND INSURANCE**          )
**COMPANY, ASSOCIATED INDEMNITY**     )
**CORPORATION, and ALLIANZ**          )
**GLOBAL RISKS UNITED STATES**        )
**INSURANCE COMPANY,**                )
                                    )
       **Defendants.**                 )
_____)

### MEMORANDUM AND ORDER ON
### DEFENDANTS' MOTION TO DISMISS

**SAYLOR, C.J.**

      This is a dispute concerning insurance coverage.  Jurisdiction is based on diversity of citizenship.

      Plaintiff Hampshire House Corporation ("Hampshire") operates four restaurants with bars in Boston, two of which also have retail services.  Beginning in March 2020, as the COVID-19 pandemic began to spread across the country, the Commonwealth of Massachusetts issued orders that required restaurants to suspend on-premises consumption of food and drink, as well as on-premises retail operations.  Hampshire's insurer, Associated Indemnity Corporation ("AIC"), denied coverage of Hampshire's insurance claims following those orders.  The amended complaint seeks damages on that basis, among others, from AIC, and Fireman's Fund Insurance Company ("FFIC") and Allianz Global Risks United States Insurance Company ("Allianz"), which allegedly control coverage decisions, for breach of contract, breach of the covenant of good faith and fair dealing, and unfair trade practices.

Defendants have moved to dismiss the complaint for failure to state a claim upon which relief can be granted, contending that the policy on its face does not provide coverage.  In the alternative, they contend that FFIC and Allianz are improper defendants, and have moved to dismiss all claims against them.  Plaintiff opposes the motion to dismiss and, in the alternative, requests leave to amend the complaint.

For the following reasons, the motion to dismiss will be granted.

## I.      Background

### A.      Factual Background

The following facts are presented as alleged in the complaint unless otherwise noted.

#### 1.      Parties

Hampshire is a Massachusetts corporation.  (Am. Compl. ¶ 1).  It operates the following businesses:  Cheers, located at 84 Beacon Street, a restaurant with a bar and event and retail services; 75 Chestnut Street, a restaurant with a bar; Cheers, located at Faneuil Hall, a restaurant with a bar and retail services; and 75 on Liberty Wharf Bar & Grill, a restaurant with a bar.  (*Id.*)

AIC and FFIC are California corporations with principal places of business in Illinois.  (*Id.* ¶¶ 2, 4).   AIC is identified as the issuer on the policy.  (*Id.* ¶ 4).  Allianz is an Illinois corporation with a principal place of business in Illinois.  (*Id.* ¶ 5).  According to the complaint, AIC does not make coverage decisions; FFIC operationally and financially controls AIC, and Allianz operationally and financially controls FFIC.  (*Id.* ¶ 7).

#### 2.      COVID-19 Pandemic

In January 2020, the first case of the infectious disease COVID-19 was confirmed in the United States.  (*Id.* ¶ 34).  Over the course of the following year and eight months, Massachusetts has reported more than 650,000 confirmed cases of COVID-19 and more than 17,500 deaths from the disease.  *See* Mass.gov, COVID-19 Interactive Data Dashboard,

https://www.mass.gov/info-details/covid-19-response-reporting (last visited June 14, 2021).  In

Suffolk County, where Boston is located, more than 23,300 cases had been confirmed as of the

filing date of the amended complaint, which was September 28, 2020.  (Am. Compl. ¶ 34).

According to the complaint, COVID-19 can be spread through aerosol transport,

respiratory droplets, or surface contact.  (*Id.* ¶¶ 35-38).  It alleges that the virus can remain stable

and transmissible for at least three hours in aerosols, up to four hours on copper, up to 24 hours

on cardboard, and up to two to three days on plastic and stainless steel.  (*Id.* ¶ 36).  Having

customers and employees in confined indoor spaces can add to the transfer of COVID-19,

particularly because asymptomatic viral carriers can infect others.  (*Id.* ¶¶ 42, 43).

To prevent and limit the spread of COVID-19, state and local authorities issued a series

of emergency orders.  (*Id.* ¶ 21).  In Massachusetts, Governor Baker issued an order on March

15, 2020, that suspended "on premises consumption of food or drink" at restaurants.  (*Id.* ¶ 23).

On March 23, 2020, Governor Baker issued an order requiring non-essential businesses to "close

their physical workplaces and facilities ('brick-and-mortar premises') to workers, customers, and

the public" until April 7, 2020, and limiting on-premises gatherings to no more than ten people.

(*Id.* ¶ 25).[1]  Subsequent orders similarly limited business operations until at least June 8, 2020,

when, during Phase 2, "limited capacity on-premises dining and on-premises shopping services"

was allowed.  (*Id.* ¶¶ 25, 72).

Hampshire's four locations, like other Boston businesses, have been subject to the orders

issued by Governor Baker.  (*Id.* ¶ 70).  The complaint alleges that the orders and the spread of

---

[1] The amended complaint did not include the entire text of the March 23, 2020 order.  However, that order, like the March 15, 2020 order, required essential businesses, which includes "[r]estaurants, bars, or other establishments that offer food or beverage to the public," and therefore includes Hampshire's businesses, to suspend "on-premises consumption of food or beverages."  Mass.gov, COVID-19 Order No. 13 (Mar. 23, 2020), https://www.mass.gov/doc/march-23-2020-essential-services-and-revised-gatherings-order/download (last visited August 12, 2021).

COVID-19 have caused "Hampshire's core business functions to be nearly eliminated or destroyed." (*Id.* ¶ 75). Between March 15 and June 8, 2020, Hampshire was permitted to provide takeout dining services, which at least one of its restaurants did, but not on-premises dining. (*Id.* ¶¶ 62, 72). Prior to reopening for limited capacity on-premises dining and shopping in June 2020, it created outdoor eating spaces, added plexiglass, and reconfigured the interiors of its premises. (*Id.* ¶¶ 72, 76). In August 2020, its Cheers Faneuil Hall business permanently closed. (*Id.* ¶ 73).

### 3.   The Insurance Policy and the Claims

Hampshire purchased an insurance policy from AIC on August 1, 2019. (*Id.* ¶ 84; *see also id.* Ex. A ("Hampshire Policy") at 8). Among other items, the policy provides "Business Income and Extra Expense" and "Civil Authority" coverage. (Hampshire Policy at 55-56).

The "Business Income Coverage Form (and Extra Expense)" defines the scope of the business income coverage in the following terms:

> We will pay for the actual loss of Business Income you sustain due to the necessary suspension of your operations during the period of restoration. The suspension must be caused by direct physical loss of or damage to property at the premises described in the Declarations, including personal property in the open (or in a vehicle) within 100 feet, caused by or resulting from any Covered Cause of Loss.

(Hampshire Policy at 55). It also provides for "Extra Expense" coverage:

> Extra Expense means necessary expenses you incur during the period of restoration that you would not have incurred if there had been no direct physical loss or damage to property caused by or resulting from a Covered Cause of Loss.

(*Id.*). It further provides the following "Civil Authority" coverage:

> We will pay for the actual loss of Business Income you sustain and necessary Extra Expense caused by action of civil authority that prohibits access to the described premises due to direct physical loss of or damage to property, other than at the described premises, caused by or resulting from any Covered Cause of Loss. This coverage will apply for a period of up to two consecutive weeks from the date of that action.

(*Id.* at 56).

4

On March 17, 2020, Hampshire provided AIC with its first notice of loss for incurred business income losses.  (*Id.* ¶ 93).  On June 16, 2020, AIC denied the claim.  (*Id.* ¶ 94; *see also id.* Ex. B ("June 16, 2020 Denial Letter")).  The denial letter stated that "[b]ecause there has been no direct physical loss of or damage to property, there has been no Covered Cause of Loss under the Policy's Business Income, Extra Expense or Civil Authority coverages of the Policy." (June 16, 2020 Denial Letter at 8).

Hampshire alleges that Allianz violated its contractual, statutory, and lawful obligations to pay its losses because Hampshire had coverage for "physical loss of or damage to the insured property from *all risks* unless expressly limited or excluded by language in the body of the Policy or through a separate exclusion endorsement," and "[t]here [were] no exclusions in Hampshire's policy for the loss of business income caused by emergency [o]rders, or the COVID-19 virus."  (Am. Compl. ¶¶ 105, 108-09).  The amended complaint further alleges that FFIC and AIC "were complicit in Allianz's position."  (*Id.* ¶ 102).

According to the complaint, defendants relied on "pre-determined conclusions of no coverage," and made their decision "without [a] reasonable investigation" and with "no basis for their factual conclusions."  (Am. Compl. ¶¶ 92, 94-97).  The complaint alleges that, at some point, Allianz posted the following message on its website:

> In general, any standard property and business interruption coverage must be triggered by physical loss or damage to property at an insured location and infectious disease is usually not a covered peril.

(*Id.* ¶ 101 (quoting Allianz's website)).  It therefore alleges that Allianz issued decisions across states with a "one-size-fits-all approach" and "without regard for applicable state statutory and decisional case law affecting coverage."  (*Id.* ¶¶ 100, 102).

### B.    Procedural Background

On July 27, 2020, Hampshire filed suit against FFIC, AIC, and Allianz.  The amended

complaint asserts claims for breach of contract (Count 1), breach of the covenant of good faith and fair dealing (Count 2), violations of Mass. Gen. Laws ch. 176D (Count 3), and violations of Mass. Gen. Laws ch. 93A (Count 4).

FFIC, AIC, and Allianz have moved to dismiss the complaint pursuant to Fed. R. Civ. P. 12(b)(6) for failure to state a claim upon which relief can be granted, or, in the alternative, to dismiss FFIC and Allianz as improper defendants.  Plaintiff opposes the motion to dismiss and, in the alternative, requests leave to amend its complaint.

## II.   <u>Standard of Review</u>

To survive a motion to dismiss, a complaint must state a claim that is plausible on its face. *See Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007).  For a claim to be plausible, the "[f]actual allegations must be enough to raise a right to relief above the speculative level . . . ." *Id.* at 555 (internal citations omitted).  "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Twombly*, 550 U.S. at 556).

In determining whether a complaint satisfies that standard, a court must assume the truth of all well-pleaded facts and give plaintiffs the benefit of all reasonable inferences.  *See Ruiz v. Bally Total Fitness Holding Corp.*, 496 F.3d 1, 5 (1st Cir. 2007) (citing *Rogan v. Menino*, 175 F.3d 75, 77 (1st Cir. 1999)).  Dismissal is appropriate if the complaint fails to set forth "factual allegations, either direct or inferential, respecting each material element necessary to sustain recovery under some actionable legal theory." *Gagliardi v. Sullivan*, 513 F.3d 301, 305 (1st Cir. 2008) (quoting *Centro Medico del Turabo, Inc. v. Feliciano de Melecio*, 406 F.3d 1, 6 (1st Cir. 2005)).

Under Massachusetts law, the interpretation of an insurance contract is a question of law. *See Boston Gas Co. v. Century Indem. Co.*, 454 Mass. 337, 355 (2009).  Courts are required to

apply general contract-interpretation principles and construe "the words of the policy in their usual and ordinary sense." *Dorchester Mutual Ins. Co. v. Krusell*, 485 Mass. 431, 437 (2020) (quoting *Metropolitan Life Ins. Co. v. Cotter*, 464 Mass. 623, 634-35 (2013)). "Every word in an insurance contract must be presumed to have been employed with a purpose and must be given meaning and effect whenever practicable . . . without according undue emphasis to any particular part over another." *Boston Gas Co.*, 454 Mass. at 355-56 (internal quotation marks and citations omitted). When in doubt, a court must consider "what an objectively reasonable insured, reading the relevant policy language, would expect to be covered." *Id.* at 356 (quoting *A.W. Chesterton Co. v. Massachusetts Insurers Insolvency Fund*, 445 Mass. 502, 518 (2005)).

Any ambiguities in an insurance policy "are interpreted against the insurer who used them and in favor of the insured." *Krusell*, 485 Mass. at 437 (quoting *Allmerica Fin. Corp. v. Certain Underwriters at Lloyd's, London*, 449 Mass. 621, 628 (2007)). An ambiguity "arises when there is more than one rational interpretation of the relevant policy language," but "is not created simply because a controversy exists between parties, each favoring an interpretation contrary to the other." *Boston Gas Co.*, 454 Mass. at 356 n.32 (internal quotation marks and citations omitted).

## III.   Analysis

On March 9, 2021, this Court issued an opinion in a lawsuit with similar facts and claims. *See Kamakura, LLC v. Greater New York Mutual Ins. Co.*, 2021 WL 1171630 (D. Mass. Mar. 9, 2021). There, plaintiffs operated two restaurants in Boston, and sought a judgment that their insurance policies covered the losses they sustained following Governor Baker's orders during the COVID-19 pandemic. The Court dismissed the case, noting that it did so with some reluctance due to the many hardships faced by restaurant owners as a result of the pandemic. Nevertheless, it concluded that the language of the policies as written could not be ignored, and

7

joined the many courts that had also concluded that such insurance policies do not provide coverage for the losses in question.

Although the Court will address certain contentions that plaintiff makes here that the plaintiffs in *Kamakura* did not raise, the reasoning in that opinion continues to apply. Accordingly, and for the following reasons, insurance coverage is not available under the policy for the losses in question, and the motion to dismiss will be granted.

### A.   **Defendants' Motion to Dismiss**

#### 1.   **Breach of Contract**

##### a.   **Business Income and Extra Expense Coverage**

Defendants contend that the amended complaint fails to state a claim for coverage under the Business Income and Extra Expense provisions.  To state a claim under those provisions, it must allege "direct physical loss of or damage to property" at plaintiff's four locations.  (Am. Compl. ¶¶ 111, 115, 117; *see also* Hampshire Policy at 55-56).  Defendants contend that the complaint fails to do so because upon disregarding conclusory statements, "[p]laintiff asserts no factual allegations in its [amended] [c]omplaint, which, even taken as true, could plausibly constitute" direct physical loss or damage to property.  (Def. Mem. at 7).

#### 1.   **"Direct Physical Loss of or Damage to Property"**

The Court must first consider the plain meaning of the policy language.  As noted, the policy provides coverage for "loss" or "damage" that is "direct" and "physical."  The policy defines "property damage" as "[p]hysical injury to tangible property, including all resulting loss of use of that property."  (Hampshire Policy at 131).  Although "physical" is not defined in the policy, taken as a whole, it is clear that the provisions do not provide coverage for financial or other intangible losses.  Instead, there must be a "physical" loss of or damage to a tangible object, such as the structure of a building.  *See SAS Int'l, Ltd. v. Gen. Star Indem. Co.*, 2021 WL

8

664043, at *2 (D. Mass. Feb. 19, 2021) ("[T]hese terms require some enduring impact to the actual integrity of the property at issue.  In other words, the phrase 'direct physical loss of or damage to' does not encompass transient phenomena of no lasting effect, much less real or imagined reputational harm."); *Harvard St. Neighborhood Health Ctr., Inc. v. Hartford Fire Ins. Co.*, 2015 WL 13234578, at *8 (D. Mass. Sept. 22, 2015) (explaining that "[i]ntangible losses do not fit within" the definition of "direct physical loss"); *Eveden, Inc. v. North Assurance Co.*, 2014 WL 952643, at *5 (D. Mass. Mar. 12, 2014) ("Intangible losses, such as a defect in title or a legal interest in property, are generally not regarded as 'physical' losses in the absence of actual physical damage to the property."); *Crestview Country Club, Inc. v. St. Paul Guardian Ins. Co.*, 321 F. Supp. 2d 260, 264 (D. Mass. 2004) (concluding that intangible losses are not "physical" losses and identifying cases where "Massachusetts courts, as well as others elsewhere, have interpreted the phrase 'direct physical loss' in a similarly narrow way"); 10A Couch on Ins. § 148:46 (3d ed. 2020) ("The requirement that the loss be 'physical,' given the ordinary definition of that term, is widely held to exclude alleged losses that are intangible or incorporeal and, thereby, to preclude any claim against the property insurer when the insured merely suffers a detrimental economic impact unaccompanied by a distinct, demonstrable, physical alteration of the property." (footnotes omitted)).

Courts in Massachusetts have adopted that interpretation when considering insurance claims for losses related to the COVID-19 pandemic.  *See Legal Sea Foods, LLC v. Strathmore Ins. Co.*, 20-cv-10850, slip op. at 7-9 (D. Mass. Mar. 5, 2021) ("Courts in Massachusetts have had occasion to interpret the phrase 'direct physical loss' and have done so narrowly, concluding that it requires some kind of tangible, material loss."); *SAS Int'l, Ltd.*, 2021 WL 664043, at *3 ("[C]onstruing the language 'physical loss of' to cover the deprivation of a property's *use* absent

any tangible damage to the property distorts the plain meaning of the Policy.  Simply put, the Policy does not cover a mere threat to the insured property without any actual physical damage having occurred." (footnote omitted)); *Vervaine Corp. v. Strathmore Ins. Co.*, 2020 WL 8766370, at *3 (Mass. Sup. Ct. Dec. 21, 2020) ("The phrase 'direct physical loss of or damage to property' in a property insurance policy like this one cannot therefore be construed to cover physical loss in the absence of some physical damage to the insured's property.").

Hampshire contends that either the actual presence of COVID-19 at their properties or the threat of COVID-19 caused a "loss of or damage to [their] propert[ies]."  (Am. Compl. ¶ 47 ("COVID-19 was present at each of the insured's locations at all relevant times, or there was an imminent risk of on-site viral presence at all relative times, or both.")).  As proof, it alleges that restaurants are "highly susceptible" to "being or becoming" affected by the presence of or rapid transmission of the virus, because the virus adheres to "common objects" found in them, such as copper, cardboard, and stainless steel, and also due to the "highly social" and "confined" nature of its properties.  (*Id.* ¶¶ 36, 38-39, 43).  In addition, it alleges that the COVID-19 virus was "ubiquitous" in all areas where Hampshire's properties are located.  (*Id.* ¶ 32).

But "presumed or imminent threat of contamination" has no physical effect on the property.  *See Vervaine Corp.*, 2020 WL 8766370, at *4 ("Equally unavailing is plaintiffs' argument that the COVID-19 virus constitutes an 'imminent threat' to their premises and thus could amount to a physical loss within the meaning of the policies.").  Indeed, courts have held that even the actual contamination of a property does not have the requisite "physical" effect. *See, e.g.*, *Legal Sea Foods*, slip op. at 8 ("A virus is incapable of damaging physical structures because the virus harms human beings, not property." (internal quotation marks and citation omitted)); *Terry Black's Barbecue, LLC v. State Auto. Mut. Ins. Co.*, 2020 WL 7351246, at *7

(W.D. Tex. Dec. 14, 2020) ("Even assuming that the virus that causes COVID-19 was present at Plaintiffs' properties, it would not constitute the direct physical loss or damage required to trigger coverage under the Policy because the virus can be eliminated.  The virus does not threaten the structures covered by property insurance policies, and can be removed from surfaces with routine cleaning and disinfectant."); *Uncork & Create LLC v. Cincinnati Ins. Co.*, 2020 WL 6436948, at *5 (S.D.W. Va. Nov. 2, 2020) ("[E]ven when present, COVID-19 does not threaten the inanimate structures covered by property insurance policies, and its presence on surfaces can be eliminated with disinfectant.").  The spread of the coronavirus is of course "physical" in the sense that the virus is a submicroscopic organism, but under the plain language of the policy, it is the loss or damage itself that must be "physical."  *See SAS Int'l, Ltd.*, 2021 WL 664043, at *4 n.4 ("[N]o reasonable construction of the phrase 'direct physical loss,' however broad, would cover the presence of a virus.").[2]

That remains true even when the virus's presence or the subsequent government orders "forced [Hampshire] to severely restrict the services it could provide."  (Am. Compl. ¶ 69).  The *Vervaine* decision reflects the position of an increasingly large majority of courts across the country, which is that restrictions on the use of property by government orders due to the threat

---

[2] For that reason, plaintiff's reliance on *Port Authority of New York & New Jersey v. Affiliated FM Ins. Co.*, 311 F.3d 226, 236 (3d Cir. 2002) is misplaced.  There, the Third Circuit found that there was a physical loss or damage where "an actual release of asbestos fibers from asbestos containing materials has resulted in contamination of the property such that its function is nearly eliminated or destroyed, or the structure is made useless or uninhabitable, or if there exists an imminent threat of the release of a quantity of asbestos fibers that would cause such loss of utility."  *Id.* at 236.  However, the court in *Port Authority* reasoned that "the effect of asbestos fibers in such quantity is comparable to that of *fire, water or smoke* on a structure's use and function," and therefore concluded that, in such quantities, it causes a physical loss or damage.  *Id.* (emphasis added).  Here, by contrast, "the virus can be removed from surfaces with routine cleaning and disinfectant."  *Terry Black's Barbecue, LLC v. State Auto. Mut. Ins. Co.*, 2020 WL 7351246, at *7 (W.D. Tex. Dec. 14, 2020); (*see* Am. Compl. ¶¶ 76-77, 115).

In addition, the court in *Port Authority* distinguished an "imminent threat" from the "the general threat of future damage from th[e] presence [of asbestos]," *id.* at 236.  Here, Hampshire's allegations about the threat of COVID-19 are only general.  (*See, e.g.*, Am. Compl. ¶¶ 32, 36-38 (explaining that there was an imminent threat of COVID-19 contaminating Hampshire's properties because it was "ubiquitous" in the Greater Boston area, and restaurants are highly trafficked, social businesses that contain many materials on which COVID-19 can remain)).

11

or presence of coronavirus do not constitute "direct physical loss" of property.  *See, e.g.*, *Brunswick Panini's, LLC v. Zurich Am. Ins. Co.*, 2021 WL 663675, at *8 (N.D. Ohio Feb. 19, 2021) ("Plaintiffs' claim for loss of full use of their premises and for business interruption is precluded under the Zurich Policy. . . .  Neither the COVID-19 virus nor the state government orders caused 'direct physical loss of or damage to' Plaintiffs' Insured Property."); *Whiskey Flats Inc. v. Axis Ins. Co.*, 2021 WL 534471, at *4 (E.D. Pa. Feb. 12, 2021) ("While the Court agrees that 'loss of' the premises can mean the loss of use, that loss of use must be tied to a physical condition actually impacting the property, which is not satisfied here.  Plaintiff did not lose use because the premises suffered physical damage; nor was the loss of use caused by actual contamination of the property."); *Karmel Davis & Assocs., Attorneys-at-Law, LLC v. Hartford Fin. Servs. Grp., Inc.*, 2021 WL 420372, at *5 (N.D. Ga. Jan. 26, 2021) ("[T]he Shelter Order itself did not cause an actual, physical change to Plaintiffs law office. . . .  Rather, the Order only limited Plaintiff in how it could use its law office for the duration of the Order.  These claims for coverage must therefore be dismissed."); *Sandy Point Dental PC v. Cincinnati Ins. Co.*, 2020 WL 5630465, at *3 (N.D. Ill. Sept. 21, 2020) ("In essence, plaintiff seeks insurance coverage for financial losses as a result of the closure orders.  The coronavirus does not physically alter the appearance, shape, color, structure, or other material dimension of the property.  Consequently, plaintiff has failed to plead a direct physical loss—a prerequisite for coverage." (footnote omitted)).[3]

Hampshire nonetheless points to an unreported decision from Massachusetts Superior

---

[3] Unlike plaintiff's policy, the policies at issue in *Brunswick Panini's* and *Whiskey Flats* contained virus exclusions.  Those exclusions, however, did not impact the courts' analyses of the availability of Business Income, Extra Expenses, and Civil Authority coverage.  *See Brunswick Panini's*, 2021 WL 663675, at *9; *Whiskey Flats Inc.*, 2021 WL 534471, at *4.

Court, *Matzner v. SEACO Insurance Co.*, 1998 WL 566658 (Mass. Sup. Ct. Aug. 12, 1998), as

"dispositive." (Pl. Opp. at 6). In *Matzner*, the court, relying on out-of-state precedents, held that

"carbon-monoxide contamination constitutes 'direct physical loss of or damage to' property. . . ."

1998 WL 566658, at *3-4. Hampshire contends that, following *Matzner*, "the words 'physical

loss' or 'damage' [are] ambiguous and [would allow] a loss of use claim associated with

[COVID-19]" because it is "analogous to dangerous gases." (Pl. Opp. at 6-7). Hampshire also

cites *Arbeiter v. Cambridge Mutual Fire Insurance Co.*, 1996 WL 1250616 (Mass. Sup. Ct. Mar.

15, 1996), in which the court, relying on a single out-of-state case, held that the "existence of

[oil] fumes may be a physical loss." 1996 WL 1250616, at *2. And in *BloomSouth Flooring

Corp.*, 562 F.3d 399 (1st Cir. 2009), the First Circuit, relying on *Arbeiter* and *Matzner*,

concluded that "odor can constitute physical injury to property under Massachusetts law" and

that "allegations that an unwanted odor permeated the building and resulted in a loss of use of

the building are reasonably susceptible to an interpretation that physical injury to the property

has been claimed." 562 F.3d at 406.[4]

    Even if those decisions are correct under Massachusetts law, they do not require a

different result.[5] To the extent there was any "loss of use" of the properties in *Matzner, Arbeiter*,

---

[4] It is unclear whether the First Circuit's conclusion that "odor can constitute physical injury to property under Massachusetts law" was part of its holding. The court was not considering a first-party claim for coverage, but instead whether an insurer had a duty to defend. It specifically explained that it did not "need [to] resolve the ambiguity issue"—whether "direct physical loss" includes "only tangible damage to the structure of the insured property" or "a wider array of losses"—because "the salient question before [the court] involves the lesser burden of determining whether the underlying complaint is 'reasonably susceptible' of stating a covered claim." *Id.* at 404-05. In other words, the court did not necessarily see *Matzner* and *Arbeiter* as correct statements of Massachusetts law but instead as support for its conclusion that the phrase "direct physical loss" was "reasonably susceptible" to an interpretation that included odors permeating a property.

[5] There is some reason to question whether those decisions are correct. Neither *Matzner* nor *Arbeiter* followed an earlier Massachusetts Appeals Court decision stating that the phrase "physical loss or damage" could not be "fairly . . . construed to mean physical loss in the absence of physical damage." *HRG Dev. Corp. v. Graphic Arts Mut. Ins. Co.*, 26 Mass. App. Ct. 374, 377 (1988) (emphasis omitted); *see also Philadelphia Parking Auth. v. Federal Ins. Co.*, 385 F. Supp. 2d 280, 289 (S.D.N.Y. 2005) (casting doubt on the *Matzner* decision). *BloomSouth Flooring*, in turn, relied entirely on *Matzner, Arbeiter*, and the out-of-state cases which they cited.

and *BloomSouth Flooring*, it was caused by the odor or fumes.  Here, conclusory allegations

aside, plaintiffs' loss of use was caused by the government orders; it was not caused by the

presence of the coronavirus itself.  *Torgerson Props., Inc. v. Continental Cas. Co.*, 2021 WL

615416, at *2 (D. Minn. Feb. 17, 2021) ("This case, then, is unlike the case of asbestos

contamination, which the Minnesota Court of Appeals found was a 'direct physical loss.' . . .

Here, it is not the presence of the virus on the premises that closed TPI's properties (or caused

people to stop visiting those properties), but rather the executive orders meant to slow the virus's

spread." (internal citation omitted)).  Massachusetts courts considering similar claims have thus

distinguished *Arbeiter*, *Matzner*, and *BloomSouth Flooring* in finding a lack of coverage.  *See*

*Legal Sea Foods*, slip op. at 10 (rejecting plaintiff's argument based on *BloomSouth Flooring*

and *Matzner*); *SAS Int'l, Ltd.*, 2021 WL 664043, at *4 (distinguishing *BloomSouth Flooring* and

*Matzner*); *Vervaine Corp.*, 2020 WL 8766370, at *4 (distinguishing *Matzner* and *Arbeiter*).[6]

In short, the presence or threat of coronavirus does not constitute a "direct physical loss

of or damage to property," even when it or subsequent government orders render that property

unusable for its intended purpose.  Hampshire therefore cannot maintain a claim for coverage

under the Business Income or Extra Expense provisions.

## 2.    Allegations of Direct Physical Loss

Even if the presence of coronavirus constitutes a "direct physical loss of or damage to

property," the complaint fails to make plausible allegations that the virus was present at

Hampshire's four locations.  To be sure, it includes allegations concerning coronavirus

transmission and the spread of the virus and COVID-19 throughout Massachusetts and the City

---

[6] Hampshire also points out that the policy does not include a virus exclusion and therefore, those cases are inapposite.  (Am. Compl. ¶ 109, 133; Pl. Opp. at 3 n.5, 5 n.8).  But "absence of an express exclusion does not operate to create coverage."  *Given v. Commerce Ins. Co.*, 440 Mass. 207, 212 (2003); *Legal Sea Foods*, slip op. at 11.

of Boston.  (*See, e.g.*, Am. Compl. ¶¶ 21-22, 32).  And it further alleges that the risk of

transmission is high in indoor environments, such as restaurants.  (*See, e.g.*, *id.* ¶¶ 38-39).  But

the complaint lacks any factual, non-conclusory allegations concerning the actual presence of the

virus, or even the presence of individuals infected with COVID-19, at Hampshire's properties.[7]

Apparently recognizing that deficiency, plaintiffs contend that they are entitled to a

reasonable inference that the virus was present at their restaurants.  (Pl. Opp. at 3; Am. Compl. ¶

45 (noting that "[an] imminent risk of contamination can be demonstrated by circumstantial

evidence")).  But even considering the highly contagious nature of the virus and its spread in

Boston, it is unduly speculative to infer that the virus was present within the confines of

Hampshire's properties.  District courts faced with similar allegations have declined to engage in

such speculation.  *See, e.g.*, *Promotional Headwear Int'l v. Cincinnati Ins. Co.*, 2020 WL

7078735, at *8 (D. Kan. Dec. 3, 2020) ("The fact that the virus travels through the air and was

present in the United States sooner than first suspected, does not support the assertion that it

'likely' exists on the surfaces of Plaintiff's property."); *Johnson v. Hartford Fin. Servs. Grp.,

Inc.*, 2021 WL 37573, at *5 (N.D. Ga. Jan. 4, 2021) ("[C]ritically, beyond this conclusory

statement the Amended Complaint does not allege that COVID-19 ever actually entered into the

dental offices.  The Amended Complaint likewise does not point to any instance of an employee

or patient contracting the virus where it was traced to the properties. . . .  They instead rely solely

---

[7] The amended complaint's allegations that COVID-19 was present at Hampshire's properties are entirely conclusory.  (*See, e.g.*, Am. Compl. ¶ 45 ("Whether a building has been contaminated prior to the emergency [o]rders or was at imminent risk of contamination can be demonstrated by circumstantial evidence"); *id.* ¶ 33 ("Upon information and belief, at all relevant times, the COVID-19 virus was present on all of Hampshire's insured properties"); *id.* ¶¶ 32, 36-38 (explaining that there is circumstantial evidence that COVID-19 was present at Hampshire's properties because it was "ubiquitous" in the Greater Boston area, and restaurants are highly trafficked, social businesses that contain many materials on which COVID-19 can remain).  *See Iqbal*, 556 U.S. at 678 ("A pleading that offers labels and conclusions or a formulaic recitation of the elements of a cause of action will not do. Nor does a complaint suffice if it tenders naked assertions devoid of further factual enhancement." (internal quotation marks, alterations, and citations omitted)).

on speculation:  *i.e.*, due to the exceedingly high number of COVID-19 cases in Georgia and

ease of person-to-person transmission during the relevant time period, COVID-19 must have

somehow found its way into the offices." (emphasis and internal footnotes omitted)); *Terry*

*Black's Barbecue*, 2020 WL 7351246, at *7 ("Plaintiffs do not allege that the virus that causes

COVID-19 was ever present at either of their restaurants.  Plaintiffs merely speculate that the

virus could have been present because of its prevalence in Austin and Dallas.  Such conclusory

allegations are insufficient to state a plausible claim that Plaintiffs' property was damaged."

(internal citation omitted)).[8]

*        *        *

In sum, the threat or presence of the coronavirus in Hampshire's four locations does not

constitute "direct physical loss of or damage to property."[9]  Even if it did, the complaint does not

provide a sufficient factual basis to suggest that coronavirus was actually present at Hampshire's

properties.  Accordingly, the Court will grant defendants' motion to dismiss Count 1 to the

extent that it depends on claims for Business Income and Extra Expense coverage.

### b.        Civil Authority Coverage

Defendants also contend that the complaint fails to state a claim for coverage under the

---

[8] In the "outlier cases" that have allowed similar complaints to survive dismissal, *SAS Int'l, Ltd.*, 2021 WL 664043, at *5, the relevant allegations went somewhat beyond those in the complaint here.  *See, e.g.*, *Studio 417, Inc. v. Cincinnati Ins. Co.*, 478 F. Supp. 3d 794, 798 (W.D. Mo. 2020) (denying insurer's motion to dismiss where the complaint alleged that "it is likely that customers, employees, and/or other visitors to the insured properties were infected with COVID-19 and thereby infected the insured properties with the virus"); *K.C. Hopps, Ltd. v. The Cincinnati Ins. Co., Inc.*, 2020 WL 6483108 (W.D. Mo. Aug. 12, 2020) (noting that *K.C. Hopps* involved similar facts to *Studio* 417, another case before the same court, and therefore, denying defendant's motion to dismiss "[f]or substantially the same reasons as those [stated] in the *Studio 417* Order."); *Blue Springs Dental Care, LLC v. Owners Ins. Co.*, 2020 WL 5637963, at *4 (W.D. Mo. Sept. 21, 2020) (finding allegation that "it is likely customers, employees, and/or other visitors to the insured properties over the recent month were infected with the coronavirus" sufficient to allege a direct physical loss).

[9] The Court need not reach plaintiff's contention that "[g]overnment action that causes direct physical loss is a standalone covered loss under this Policy."  (Pl. Opp. at 12).

16

Civil Authority provision.  In particular, they contend that the orders did not completely prohibit access to Hampshire's restaurants and that the orders were not issued as a result of damage to property.

To state a claim for coverage under that provision, the complaint must allege that (1) there was "direct physical loss of or damage to property, other than at the [insured] premises"; (2) "actual loss of Business Income . . .  and necessary Extra Expense caused by action of civil authority that prohibits access to the [insured] premises" as a result of that loss or damage; and (3) that the loss or damage was "caused by or resulting from any Covered Cause of Loss."  (Hampshire Policy at 56).

Here, the amended complaint does not allege that the orders were issued as a result of damage to other property.  First, it does not identify any other property that was damaged.  As discussed, the mere presence of the coronavirus does not constitute property damage.  *See SAS Int'l Ltd.*, 2021 WL 664043, at *4 n.4 ("[N]o reasonable construction of the phrase 'direct physical loss,' however broad, would cover the presence of the virus."); *Vervaine Corp.*, 2020 WL 8766370, at *5 (concluding that the complaint failed to state a claim for civil-authority coverage because, among other things, it "failed to allege damage to property, either at [plaintiffs'] restaurants or at any other building within a mile thereof").[10]

Second, even if the presence of coronavirus constituted property damage, the complaint includes only general allegations concerning the presence of the virus in Massachusetts and the City of Boston.  (*See, e.g.*, Am. Compl. ¶¶ 21-22, 117-18).  It fails to identify a specific "property, other than at the described premises."  (Hampshire Policy at 56; Am. Compl. ¶¶ 117-

_____

[10] The amended complaint relies on the general inference that "many properties and people were contaminated in Boston."  (Pl. Opp. at 6 n.9).  But again, such conclusory allegations are not sufficient.  *See Iqbal*, 556 U.S. at 678.

18 (discussing the civil authority endorsement)).  The Civil Authority provision, however, plainly contemplates an identifiable "other" property.  (Hampshire Policy at 56).  Civil Authority coverage is not triggered when the virus is in the area surrounding Hampshire's properties; instead, it is triggered when Hampshire's properties are within an area to which a civil authority has prohibited access.  Without identifying a specific damaged property, Hampshire cannot satisfy that requirement.  Indeed, the orders were preventative and not limited to property that had been affected by the coronavirus or that was near other property that had been so affected. *See Dickie Brennan*, 636 F.3d at 685-87 (finding no civil-authority coverage for claim based on mandatory evacuation order that was issued "because of anticipated high lake and marsh tides due to the tidal surge, combined with the possibility of intense thunderstorms, hurricane force winds, and widespread severe flooding"); *Elegant Massage, LLC v. State Farm Mut. Auto. Ins. Co.*, 2020 WL 7249624, at *11 (E.D. Va. Dec. 9, 2020) ("[T]he Civil Authority Coverage does not apply because Plaintiff has not shown a causal link between any physically damaged or dangerous surrounding properties proximate to the insured property and a civil authority prohibiting Plaintiff's from accessing or using their property.  That is, the Executive Orders were issued because 'COVID-19 presents an ongoing threat to [Virginia] communities', and not because of prior actual 'physical damage' to its own property or surrounding properties."); *Mudpie, Inc. v. Travelers Cas. Ins. Co.*, 2020 WL 5525171, at *7 (N.D. Cal. Sept. 14, 2020) ("Mudpie's allegations establish that the government closure orders were intended to prevent the spread of COVID-19.  Because the orders were preventative—and absent allegations of damage to adjacent property—the complaint does not establish the requisite causal link between prior property damage and the government's closure order." (internal citation omitted)).  Instead, the

orders prohibited particular uses of properties.[11]

Even if the amended complaint alleged that the orders were issued as a result of damage to other property, it would nevertheless fail to state a claim for Civil Authority coverage because the orders did not prohibit access to Hampshire's properties.  The orders prohibited plaintiffs from using their properties for certain purposes, but they did not prohibit employees or customers from accessing the properties.  (*See, e.g.*, Am. Compl. ¶ 72 ("[C]ontinuing through various phases, Hampshire was not permitted to provide on-premises dining services, operating in some situations with takeout and delivery services only."); Def. Mem. at 11 n.2 (quoting Governor Baker's March 23 order) ("[R]estaurants, bars, and other retail establishments that sell food and beverage products to the public provide COVID-19 Essential Services . . . [and] are therefore encouraged to continue to offer food and beverages for take-out and by delivery.")).  Hampshire's claims therefore fall outside the scope of the Civil Authority coverage.  *See Legal Sea Foods*, slip op. at 13 ("Although Legal alleges that the Orders mandated the closure of and prohibited access to some of its insured restaurants, plaintiff fails to identify any specific Order that expressly and completely prohibited access to any of the Designated Properties."); *Vervaine Corp.*, 2020 WL 8766370, at *5 ("[P]laintiffs, their employees, and their customers have not been prohibited from accessing the insureds' restaurants, a fact the Complaint plainly concedes.  Rather, the scope of permitted use of those physical spaces was altered by the Governor's Orders.  Plaintiffs still had access to the premises to prepare food and for takeout and delivery.").

Accordingly, the Court will grant defendants' motion to dismiss Count 1 to the extent that it depends on claims for Civil Authority coverage.

---

[11] The policies at issue in *Elegant Massage* and *Mudpie* contained virus exclusions, but those exclusions did not impact the courts' analyses of the availability of civil-authority coverage.  *See Elegant Massage*, 2020 WL 7249624, at *11; *Mudpie, Inc.*, 2020 WL 5525171, at *7 n.9.

c.      **Other Sources of Coverage**

Although defendants also contend that the amended complaint fails to state a claim for coverage under the "Property-Gard" Restaurant Plus Extension, Crisis Management, and Communicable Disease and Hospitality Industry Additional Coverage Extensions endorsements, it appears that plaintiff no longer asserts any claims against them on the basis of those endorsements.  (Am. Compl. ¶ 119 (noting that such endorsements may provide coverage); Pl. Opp. at 3, n. 3 ("At the present time, Plaintiff has not presented claims for Crisis Management Coverage, Off Premises Special Event Cancellation, [] Hospitality Industry Coverage, [or] Property-Gard Restaurant Plus Coverage because Plaintiff[] [is] not aware of facts warranting such coverage.  If it is later determined that appropriate facts exist, Plaintiff will supplement its claim, and, if necessary, file suit or move to amend.")).  Accordingly, the Court need not address those claims.

2.      **Breach of the Implied Covenant of Good Faith and Fair Dealing**

Defendants also contend that the amended complaint fails to state a claim that they breached the implied covenant of good faith and fair dealing.  Under Massachusetts law, a covenant of good faith and fair dealing is implied in every contract.  *UNO Restaurants, Inc. v. Boston Kenmore Realty Corp.,* 441 Mass. 376, 385 (2004).  The covenant provides that "neither party shall do anything that will have the effect of destroying or injuring the rights of the other party to receive the fruits of the contract."  *Anthony's Pier Four, Inc. v. HBC Associates*, 411 Mass. 451, 471–72 (1991).  The implied covenant may not, however, be invoked to create rights and duties not contemplated by the provisions of the contract or the contractual relationship. *UNO Restaurants,* 441 Mass. at 385–86; *AccuSoft Corp. v. Palo*, 237 F.3d 31, 45 (1st Cir. 2001).

Plaintiff alleges that defendants breached the implied covenant because they never investigated plaintiff's claim, and instead made a "summary," "pre-determined" decision to deny

coverage for "claim[s] related to COVID-19 or the Government Orders." (Defs. Supp. Mem. at 16; Am. Compl. ¶¶ 95-97; *see also id.* ¶ 94 ("On June 16, 2020, Defendants denied the claim without any meaningful or honest investigation of the facts or contractual terms." (citing June 16, 2020 Denial letter at 4)); Am. Compl. ¶ 101 (noting that Allianz's website states that "infectious disease is usually not a covered peril")). But defendants' position that coverage should be denied was objectively reasonable under the circumstances in light of the interpretation of "physical loss of or damage to property" by Massachusetts courts and plaintiff fails to point to any otherwise-unknown facts that such an investigation would have revealed.[12]

Accordingly, the Court will grant defendants' motion to dismiss plaintiff's claim for a breach of the implied covenant of good faith and fair dealing (Count 2).

### 3.     Violation of Mass. Gen. Laws Chapters 176D and 93A

The amended complaint alleges that defendants violated Mass. Gen. Laws ch. 176D by, among other things, "[r]efusing to pay claims without conducting a reasonable investigation"; "compelling insureds to engage in litigation to recover amounts due"; and failing to "settle claims promptly" or "[promptly] provide [] a reasonable explanation . . . for [the] denial." (Am. Compl. ¶ 135). It contends that defendants violated Mass. Gen. Laws ch. 93A for apparently the

---

[12] On a motion to dismiss, a court may consider documents attached to the complaint as well as the complaint itself. *Trans-Spec Truck Serv., Inc. v. Caterpillar Inc.*, 524 F.3d 315, 321 (1st Cir. 2008). Although uncommon, a plaintiff "may plead [herself] out of court by attaching documents to the complaint that indicate that he or she is not entitled to judgment." *Matter of Wade*, 969 F.2d 241, 249 (7th Cir. 1992); *see Barricello v. Wells Fargo Bank, N.A.*, 2016 WL 1244993, at *10 (D. Mass. Mar. 22, 2016) ("When a document attached to a complaint contradicts an allegation in the complaint, the document trumps the allegation.").

Here, plaintiff cited AIC's June 16, 2020 letter in support of its contention that AIC did not thoroughly investigate its claim, and attached that letter to its complaint. The letter may therefore be considered. The reasons that Hampshire cited for denying coverage—that is, that there was a "reduction in normal income due to Governor Baker's proclamations"; that some restaurants were doing takeout; and that there had "not been physical damage at the location" nor any "known COVID-19 positive cases," (June 16, 2020 Denial Letter at 4), are consistent with the allegations in the amended complaint, except that the amended complaint pleads in the alternative that the actual presence or threat of COVID-19 contamination caused its damages. (*See, e.g.*, Am. Compl. ¶¶ 72, 78-79).

same reasons.  (Am. Compl. ¶¶ 136-38 (incorporating by reference the preceding paragraphs, but not alleging any other specific factual allegations as to its claim under chapter 93A)).

Chapter 93A makes unlawful "unfair or deceptive acts or practices in the conduct of any trade or commerce."  Mass. Gen. Laws ch. 93A, § 2(a).  Chapter 176D catalogues "unfair methods of competition and unfair or deceptive acts or practices in the business of insurance."  Mass. Gen. Laws ch. 176D, § 3.  Those practices include unfair claim-settlement practices, such as failing to investigate claims promptly and reasonably, failing to affirm or deny coverage of claims in a timely manner, and failing to pay claims or make reasonable settlement offers once liability has become reasonably clear.  *See id.* § 3(9).

Chapter 176D does not create a private cause of action, and is enforceable only by the state commissioner of insurance.  Mass. Gen. Laws ch. 176D, § 6 (providing for enforcement by the Commissioner of Insurance); *see, e.g.*, *Metro. Prop. & Cas. Ins. Co. v. Boston Reg'l Physical Therapy, Inc.*, 538 F. Supp. 2d 338, 343 (D. Mass. 2008).  Accordingly, defendants' motion to dismiss Count 3, which alleges a stand-alone claim under Chapter 176D, will be granted.

Claims under Chapter 93A may be based on conduct that also violates Chapter 176D.  *Continental Ins. Co. v. Bahnan*, 216 F.3d 150, 157 (1st Cir. 2000) ("[C]onduct that abridges [Chapter 176D] may or may not abridge [Chapter 93A]"); *see, e.g.*, *Nyer v. Winterthur Int'l*, 290 F.3d 456, 461 n. 7 (1st Cir. 2002) ("[T]he legislature amended [C]hapter 93A, granting consumers a private cause of action against insurers who violate [C]hapter 176D.").  The SJC has concluded that "a violation of General Laws chapter 176D, § 3 . . . is evidence of an unfair business practice under chapter 93A, § 2, which would give rise to a cause of action under chapter 93A, § 11."  *Fed. Ins. Co. v. HPSC, Inc.*, 480 F.3d 26, 35 (1st Cir. 2007) (citing *Polaroid Corp. v. Travelers Indem. Co.*, 414 Mass. 747, 754-55 (1993); *Peterborough Oil Co. v.*

22

*Great Am. Ins. Co.*, 397 F. Supp. 2d 230, 244 (D. Mass. 2005)).[13]

To determine whether a business practice is unfair under Chapter 93A, courts must consider "(1) whether the practice . . . is within at least the penumbra of some common-law, statutory, or other established concept of unfairness; (2) whether it is immoral, unethical, oppressive, or unscrupulous; [and] (3) whether it causes substantial injury to consumers (or competitors or other businessmen)." *PMP Assocs., Inc. v. Globe Newspaper Co.*, 366 Mass. 593, 596 (1975) (internal quotation marks and citation omitted).  To be actionable under section 11, the conduct in question must constitute an "extreme or egregious" business wrong or "commercial extortion," or rise to some similar level of "rascality" that raises "an eyebrow of someone inured to the rough and tumble of the world of commerce." *Peabody Essex Museum, Inc. v. United States Fire Ins. Co.*, 802 F.3d 39, 54 (1st Cir. 2015) (citing *Baker v. Goldman Sachs & Co.*, 771 F.3d 37, 49-51 (1st Cir. 2014); *Zabin v. Picciotto,* 73 Mass. App. Ct. 141, 169 (2008).  In cases involving insurance disputes, the presence of extortionate tactics and the absence of good faith "generally characterize" actions under Chapters 93A and 176D.  *See Guity v. Commerce Ins. Co.*, 36 Mass. App. Ct. 339, 344 (1994).

Those chapters do not, however, impose liability in cases of good-faith disputes over insurance coverage in which liability is "not reasonably clear." *Id.* at 343.  Such disputes do not constitute unfair or deceptive trade practices, even if a court ultimately overrules the insurer's denial of a claim, as long as that denial was made in good faith, based upon a plausible interpretation of the insurance policy, and was not otherwise immoral, unethical, or oppressive.

---

[13] Defendants contend that plaintiff cannot bring a claim under Mass. Gen. Laws ch. 93A, § 11 because plaintiff is a commercial entity.  (Defs. Supp. Mem. at 19, n. 3) (citing *Kiewet Const. Co. v. Westchester Fire Ins. Co.*, 878 F. Supp. 298, 301 (D. Mass. 1995) ("The SJC itself, on at least two occasions, has also rejected the theory that commercial plaintiffs may bring suit under Section 11 of 93A for purported violations of 176D.")).  The Court does not reach that issue here.

*See, e.g.*, *New England Envtl. Techs. v. Am. Safety Risk Retention Grp., Inc.*, 738 F. Supp. 2d 249, 259 (D. Mass. 2010) ("Because [the insurer] based its denial on a plausible, albeit erroneous, interpretation of the policy language, its conduct did not constitute a violation of Chapter 176D."); *Boston Symphony Orchestra, Inc. v. Commercial Union Ins. Co.*, 406 Mass. 7, 15 (1989) ("In good faith, [the insurer] relied upon a plausible, although ultimately incorrect, interpretation of its policy.  There is nothing immoral, unethical or oppressive in such an action. . . . We hold that [the insurer] did not engage in unfair or deceptive acts in this case."); *Guity*, 36 Mass. App. Ct. at 343 ("A plausible, reasoned legal position that may ultimately turn out to be mistaken—or simply, as here, unsuccessful—is outside the scope of the punitive aspects of the combined application of c. 93A and c. 176D.").

Here, defendant correctly denied coverage under the policies.  Massachusetts trial and appellate courts have repeatedly ruled that where an insurer correctly denies coverage, Chapter 93A claims related to that denial cannot survive.  *See, e.g.*, *Legal Sea Foods*, slip op. at 15 ("The Court has concluded that Strathmore correctly denied coverage under the Policy.  Therefore, dismissal of the Chapter 93A claim is warranted."); *Styller v. Nat'l Fire & Marine Ins. Co.*, 95 Mass. App. Ct. 538, 546 (2019) ("When coverage has been correctly denied, as in this case, no violation of the Massachusetts statutes proscribing unfair or deceptive trade practices may be found." (quoting *Transamerica Ins. Co. v. KMS Patriots, L.P.*, 52 Mass. App. Ct. 189, 197 (2001))); *Entwistle v. Safety Indem. Ins. Co.*, 2015 WL 1602599, at *7 n.13 (Mass. Sup. Ct. Mar. 31, 2015) ("Given my conclusion that York properly applied its policy's 10% sub-limit, it could not have violated [Chapter 93A] on the facts of this case."); *Metro. Life Ins. Co. v. Cotter*, 2011 WL 2367906, at *14 (Mass. Sup. Ct. Feb. 7, 2011) ("An insurer which correctly denies a claim

has not violated either [Chapter 93A or Chapter 176D].").[14]

Even if the denial was mistaken, the complaint here alleges nothing more than a good-faith dispute over interpretations of the insurance policies.  Such disputes are "not the stuff of which a [Chapter 93A] claim is made."  *Duclersaint v. Fed. Nat. Mortg. Ass'n*, 427 Mass. 809, 814 (1998) (citing *Kobayashi v. Orion Ventures, Inc.*, 42 Mass. App. Ct. 492, 505 (1997); *Framingham Auto Sales, Inc. v. Workers' Credit Union*, 41 Mass. App. Ct. 416, 418 (1996)).  Because the denials were based on plausible understandings of the policies, they are not actionable under Chapter 93A.  *See New England Envtl. Techs.*, 738 F. Supp. 2d at 259; *Boston Symphony Orchestra, Inc*, 406 Mass. at 15; *Guity*, 36 Mass. App. Ct. at 343.

Hampshire nonetheless contends that the allegations in the complaint go beyond a disagreement concerning policy interpretation.  Specifically, the complaint alleges that "Allianz chose to blanket deny coverage in violation of its statutory and contractual duties for the purpose of saving its bottom line."  (Am. Compl. ¶ 99).  It further alleges that defendants' denial and lack of "meaningful or honest investigation" violated "contractual, statutory, and common law duties to act reasonably and in good faith."  (*Id.* ¶¶ 94, 102).

Those allegations are entirely conclusory.  And it is not clear from the complaint what made defendant's investigation, or lack of investigation, unreasonable.  It alleges that defendant did not investigate, "adjust potential losses under the Policy coverages," or "provid[e] [a] basis for their factual conclusions."  (*Id.* ¶¶ 96-97).  But because defendants' denials were primarily

---

[14] That expression of a categorical rule may somewhat oversimplify Massachusetts law, as there may be unusual circumstances where such a claim under Chapter 93A might survive even if there is no coverage under the policy.  For example, in *Jet Line Services, Inc. v. American Employers Insurance Co.*, 404 Mass. 706 (1989), the Supreme Judicial Court found that an insurer that correctly disclaimed coverage still violated Chapter 93A by leading the insured to believe that coverage was available.  *See id.* at 710-17.  Indeed, the First Circuit, relying on *Jet Line Services*, has stated that "[a] party is not exonerated from chapter 93A liability because there has been no breach of contract."  *NASCO, Inc. v. Public Storage, Inc.*, 127 F.3d 148, 152 (1st Cir. 1997).

based on policy interpretations, not factual findings, it is not clear what would make those actions unreasonable under the circumstances.   The facts underlying the claims, much like the facts underlying the present lawsuit, are largely, if not entirely, undisputed.  Nor can the speed with which defendants denied Hampshire's claims support a claim for unfair or deceptive trade practices.  In fact, insurance companies risk liability under Chapter 93A and Chapter 176D when they do not timely affirm or deny claims.  *See* Mass. Gen. Laws ch. 176D, § 9 ("An unfair claim settlement practice shall consist of . . . [f]ailing to acknowledge and act *reasonably promptly* upon communications with respect to claims arising under insurance policies; . . . [f]ailing to adopt and implement reasonable standards for the *prompt investigation* of claims arising under insurance policies; . . . [f]ailing to affirm or deny coverage of claims *within a reasonable time* after proof of loss statements have been completed; . . . or [f]ailing to provide *promptly* a reasonable explanation of the basis in the insurance policy in relation to the facts or applicable law for denial of a claim or for the offer of a compromise settlement." (emphases added)).

In short, because the allegations in the complaint amount to nothing more than a good-faith dispute over policy interpretation, they do not state a claim under Chapter 93A. Accordingly, the Court will grant defendants' motion to dismiss Count 4.

**B.      Plaintiff's Request to Amend the Complaint**

Plaintiff has requested as an alternative to dismissal, that it be granted leave to amend its complaint.  Its opposition stated as follows:

> Defendants are clearly on notice of Plaintiff's theories of liability, but still claim
> that they could have been stronger or more precise (which Plaintiff[] refute[s]).
> Plaintiff believes that is a matter for discovery.  Nevertheless, plaintiff would ask
> leave to amend.

(Pl Opp. at 20).

The practice of waiting to amend a complaint until after the Court has ruled on a motion

26

to dismiss is problematic.  As the First Circuit noted in *ACA Fin. Guar. Corp. v. Advest, Inc.*, 512

F.3d 46, 57 (1st Cir. 2008):

> The plaintiffs argue that in the end, they were entitled to wait and see if their
> amended complaint was rejected by the district court before being put to the costs
> of filing a second amended complaint.  They claim this would promote efficiency
> in the judicial system.  Plaintiffs have it exactly backwards—their methodology
> would lead to delays, inefficiencies, and wasted work.  The plaintiffs do not get
> leisurely repeated bites at the apple, forcing a district judge to decide whether
> each successive complaint was adequate. . . .  Plaintiffs may not, having the
> needed information, deliberately wait in the wings for a year and a half with
> another amendment to a complaint should the court hold the first amended
> complaint was insufficient.  Such an approach would impose unnecessary costs
> and inefficiencies on both the courts and party opponents.  This court expressly
> disapproved a similar tactic in *James* [*v. Watt*, 716 F.2d 71 (1st Cir. 1983)], and
> we do so again.  *See id.* at 78 ("Such a practice would dramatically undermine the
> ordinary rules governing the finality of judicial decisions, and should not be
> sanctioned in the absence of compelling circumstances." (citing 6 Wright &
> Miller, Federal Practice and Procedure § 1489 (1971))).

Here, plaintiff was "put on notice of the deficiencies in the complaint by the motion to

dismiss.  If [he] had something relevant to add, [he] should have moved to add it then."  *Fire &*

*Police Pension Ass'n of Colo. v. Abiomed, Inc.*, 778 F.3d 228, 247 (1st Cir. 2015).  Under the

circumstances, plaintiff has not provided a valid reason for permitting further amendment.

Accordingly, the motion to amend will be denied.

**IV.**     <u>**Conclusion**</u>

For the foregoing reasons, defendants' motion to dismiss is GRANTED.

**So Ordered.**


                                            /s/ F. Dennis Saylor IV
                                            F. Dennis Saylor IV
Dated:  August 26, 2021                     Chief Judge, United States District Court

27